UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
UNITED STATES OF AMERICA    :
                            :
      -against-             :
                            :        15-95
JURABOEV, et. al, AZIZJON   :        WFK
RAKHMATOV,                  :
                            :
            Defendant       :
                            :
---------------------------------------------------------x

DEFENDANT AZIZJON RAKHMATOV'S
PRESENTENCE REPORT OBJECTIONS
AND SENTENCE MEMORANDUM

LAWRENCE MARK STERN, ESQ.
100 Hudson Street, #6A
New York, N,Y, 10013
(212) 925-6863

## TABLE OF CONTENTS

OBJECTIONS TO THE PRESENTENCE REPORT. . . . . . . . . . . . . . . . . . . . . . 1

1. The Inapplicability and Unconstitutionality
   of the Terrorist Enchancement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2. The Unfounded, Unsupported, and Unfair
   Nature of the Terrorist Enhancement. . . . . . . . . . . . . . . . . . . . . . . 10

3. Compounding the Sentence for Both Terrorism and
   Assistance to Violence Would be Double Counting. . . . . . . . . . . . 11

4. Other Objections to the PSR. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

SENTENCE MEMORANDUM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
Guideline Downward Departure and Sentence Based
on the §3553(a) Factors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    A. Departures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    B. §3553(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        (1) Influences on Mr. Rakhmatov's Character
            That Motivated His Intent to Contribute to
            Saidakhmetov's Travel to Join ISIS. . . . . . . . . . . . . . . . 19

        (2) Mr. Rakhmatov's Background, the
            Offense, and the Most Parsimonious
            Sentence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

            (a) Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

            (b) The Offense. . . . . . . . . . . . . . . . . . . . . . . . . . . 26

            (c) Good Works and Commendations
                in Prison. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        (3) The Need for the Sentence Imposed. . . . . . . . . . . . . . 32

        (4) The Kinds of Sentences Available,
            Including the Nature of the Punishments
            Already Received and Yet to Come. . . . . . . . . . . . . . 36

        (5) Protection of the Public. . . . . . . . . . . . . . . . . . . . . . . . 39

MR. RAKHMATOV'S LETTER TO THE COURT. . . . . . . . . . . . . . . . . . . . . . 40

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

## OBJECTIONS TO THE PRESENCE REPORT

1.    The Inapplicability and Unconstitutionality of the Terrorist Enhancement

The Presentence Report ("PSR" or "the Report") adds 12 points to Mr. Rakhmatov's Guideline offense level and raises his Criminal History Category from I to IV, on the grounds that his offense "involved or was intended to promote a federal crime of terrorism." USSG §3A1.4(a); PSR ¶'s 25. 26. 35. He submits that imposition of these automatic sentence escalators would be erroneous, because the Report does not set forth, nor has the government proved by a preponderance of evidence, facts that would support the enhancements.

The government has the burden to prove to the Court by a proponderance of the evidence facts that establish the elements of the Guideline enhancement . *United States v. Gigante*, 94F.3d 53, 55 (2d Cir. 1996). The requirement for the enhancement is that the offense of conviction involved, or was intended to promote, a federal crime of terrorism. USSG 3A1.4. A federal crime of terrorism is "an offense that ... is calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct." 18 U.S.C. §2332b(g)(5). "A conviction for material support of a terrorist organization does not necessarily imply that the defendant committed an offense of terrorism or that he provided firearms to that organization.[1] Not all material support for terrorism is

---

[1] Referring to the separate enhancement of 2 points for providing firearms with the intent for use in a violent act. *USSG* 2M 5.3(b)(1).

1

calculated to affect government conduct or always involve weapons." *United States v. Banol-Ramos*, 516 Fed.Appx 43, 47 (2d Cir. 2013).

Congress specifically cautioned that the crime of providing material support to a terrorist organization is not a terrorist act. It is characterized as "terrorism" only if "motivated to affect the conduct of government or social policy." *House Report, H.R. Rep. No. 104-383, p.39 1995*. "It is possible to be guilty of providing material support to a foreign terrorist organization but not guilty for the terrorist enhancement." *United States v. Fawsi Mustapha Assi*, 428 Fed.Appx. 570, 572 (6th Cir. 2011), quoting 18 U.S.C. §2332b(g)(5)(A). Even though "there is little doubt that [the defendant] (1) knew that the objective of [a codefendant and the terrorist organization] was to influence the Indian government through violence and (2) knew that the money he provided to [the terrorist organization] would be used toward that end," the Second Circuit holds that these facts alone are insufficient for imposition of the enhancement. *United States v. Alwan*, 607 F.3d 306, 317 (2010). Other appellate courts have also declined to impose the enhancement on similar grounds. *United States v. Stewart (Yousry)*, 590 F.3d 93, 136-139 (2009); *United States v. Chandia* 514 F.3d 365 (4th Cir. 2008). District Courts in this District and elsewhere have also rejected application of the enhancement . *United States v. Shehadeh*, 2013 WL 6049001 (E.D.N.Y.  2013) (Vitaliano, J.). *United States v. Sihai Cheng*, 2016 WL 413077 (D. Mass. 2016).

For the terrorism enhancement to apply, the government must establish "that the defendant possessed the 'specific intent ... to commit an offense that was

calculated to influence,' government conduct," by intimidation or coercion, or to

retaliate against government conduct *United States v.Banol- Ramos, supra* at 48. In

*Banol-Ramos*, involvement with, and having a good deal of knowledge of, the

terrorist organization, and participating in a hostage-taking of government police

officials, did not constitute sufficient proof of the specific intent to influence the

conduct by intimidation or coercion at the time of the offense of conviction.

In *Stewart (Yousry)*, the enhancement could not be applied to the sentence

for providing material support to a conspiracy to murder persons in a foreign

country " because the defendant did not act with the requisite state of mind." 509

F.3d at 136. In support of the enhancement, the government conceded that Yousry

did not have the requisite purpose stated in §2332b, but argued that his conspirators

did. The Court rejected the argument, because "there is no evidence that Yousry

himself sought to influence or affect the conduct of the government." *Id* at 138.

In *United States v. Chandia, supra*, the Court rejected the government's

argument that the defendant's active duties as the assistant to the leader of a

terrorist organization, including his shipping of mateials to Pakistan for purposes of

terrorist training, did not suffice to support imposition of the enhancement: "the

acts underlying the conviction in this case were not violent terrorist acts." 514 F.3d

at 376.

Judge Vitaliano of this Court held that the enhancement could not be applied

to a defendant who had attempted to join the army to wage jihad and kill American

soldiers. Judge Vitaliano held that, "his conduct in doing so was simply too remote

3

from an attack on American soldiers abroad to qualify as conduct warranting the §3A1.4 [terrorist] enhancement." *United States v. Shehadeh, supra* at *2. "What he did, as opposed to what he hoped to do, could not be characterized as conduct sufficient to have been 'intended to promote' the oversees murder of Americans or any other 'federal crime of terrorism. *Ibid.*

*United States v . Jumaev*, No. 12-cr-00033-JLK, 2018 WL 3490886, 2018 U.S. Dist. Lexis, (D. Colo. June 18, 2018, attached hereto as Ex. 1, is a case similar to this one. The defendant gave $300 to a terrorist organization with which he had no affiliation and no part in any of its decision-making structures, and the government presented no evidence that the terrorist organization was involved in conduct described in §2332b during the period the defendant was charged with conspiracy to provide it material support, nor did the government's prove that the defendant "knew about and certainly not that he intended to promote, any plan by [the terrorist organization] to commit politically-motivated crime of terrorism." *Id* at 12.

In *United States v. Sihai Cheng*, 2016 WL 413077 (D. Mas. 2016), the government argued that the enhancement should apply to a defendant whose export of equipment which facilitated Iran's nuclear weapons program inherently influenced the conduct of the other governments around the world. The Court declined to impose the enhancement, because there was no evidence of the defendant's specific intent to attack government infrastructure or targets.

4

The PSR describes Mr. Rakhmatov's offense conduct, that he agreed to try to collect money and contibuted $400 to help Akhror Saidakhmetov travel to Syria "to fight on behalf of ISIS against the government of Bashir al Assad and in order to protect those people who were engaged in hostilities against, and were the victims of, that government." He understood that Saidakhmetov was planning to buy a gun in Syria. Report ¶s19, 20-22. Mr. Rakhmatov stipulated to these facts in his plea agreement, where he also stipulated that for several years prior to the $400 transfer to Saidakhmetov he "gave and collected money to support the fighters in Syria, their families, and widows of men killed in battle. Plea Agreement, pp. 3-4.

According to the law and cases cited above, these facts do not warrant imposition of the terrorist enhancement, because they do not evidence Mr. Rakhmatov's specific intent to be involved in calculating to influence or affect the conduct of the government by intimidation or coercion, to retaliate against government conduct, or to promote the calculation to influence or affect such conduct 18 U.S.C. §2332b(g)(5); USSG §3A.1.4. These facts do not establish by a preponderance of the evidence that Mr. Rakhmatov's general intent or hope that the Bashir al Assad government be opposed for its continuing massacre of Muslim civilians in Syria was the "specific intent" to commit a specific act of terrorist crime. *United States v. Shehadeh, supra.*

He had no specific intent, to attack government infrastructure or targets (*United States v. Sihai Cheng, supra*); he did not "promote a 'plan' [by ISIS] to commit a politically motivated crime of terrorism" (*United States v. Jumaev, supra*

at 12). There is no evidence in the PSR that ISIS was committing specific acts of terrorism in Syria or the United States during the period of the indictment. See Report of Dr. Sageman, Ex 18. Any intent or plan to commit specific criminal acts by his coconspirators cannot as a matter of law be attributed to him (*United States v. Stewart (Yousry), supra*, at 136, 138). His knowledge that ISIS is a terrorist organization, and that the contribution was helping another person to join or even fight on its behalf, does not establish his specific intent to influence the conduct of government by intimidation or coercion. *United States v. Banol-Ramos, supra.* "[Mr. Rakhmatov's] conduct ... was simply too remote from an attack ... to qualify as conduct warranting this §3A1.1 enhancement" *United States v. Shehadeh, supra*, at *2.

The non-violent nature of acts of providing material support, even materials which might eventually be used in violent acts, "make this [a] case distinct from those that have applied the terrorist enhancement." *United States v. Sihai Cheng, supra*, at *5. Mr. Rakhmatov's agreement to provide material support to a terrorist organization does not alone constitute the specific intent required by the enhancement, when, as here, there were no specific acts of violence, intimidation, or coercion by Mr. Rakhmatov which might be a factor in support of such specific intent. *United States v. Stewart (Yousry, supra*; cf, *United States v. Banal-Ramos, (Ibarguen) supra.* Mr. Rakhmatov's knowledge that the man he was helping intended to purchase a gun in Syria did not render Mr. Rakhmatov's act of support a crime of violence. Neither conspiracy to posses a gun nor possession of gun is an

act of violence [cites]. *United States v. Gamez*, 577 F.3d 394 (2d Cir. 2009); *United States v. Barett*, 937 F.3d 126 (2d Cir. 2019). See case at p. 12.

Acts of non-violent material support provided to those fighting in self-defense against a brutally oppressive tyrannical regime do not constitute the "conduct" "calculated to influence or affect the conduct of government" within the language and intent of §2332(b)(g)(5). Nor do such acts constitute the statutory definition of "intimidation or coercion." The Al Assad regime is not a "government," within the terms and meaning of the statute. It is apparent from the language and intent of the legislation, and its interpretation by the courts, that massacres by what the United States regards as a "state sponsor of terrorism" (https://www.State.gov/reports/country-reports-on-terrorism-2019/syria/) are not the conduct that Congress intended to protect by passage of the statute and the enhancement guideline.

USSG 3A1.4 is one of several "Victim Related Adjustments" which increase the guideline offense level. USSG, Chapter Three, Part A. The victims to be protected are Americans, for example the American military personnel killed in a discotheque bombing in Germany, the victims of the bombing of the U.S Embassy in Beirut and the Pan Am flight 103, the individual victim American tourist Leon Klinghafer, and other Americans killed by terrorists. House Repot, H.R. Rep. 104-383, 1995 WL 731698, p. 41.

"With the bombing of the Alfred P. Murrah Federal Office Building in Oklahoma City, on April 19, 1995, the need for this legislation was dramatically

7

and tragically reinforced." *Id* at p.37. The purpose is "to protect ourselves" (p. 38), "to protect the lived and safety of its citizens" (*Ibid*), against "harm to innocents", to protect "all Americans" against threats to "our public safety" (p. 41), to protect "innocents ... annihilated" (Ibid), to "protect our national security" (p. 47). The Report states that "it is up to our government to protect the lives and property of our citizens." *Id* at 46. "The government's interest in preventing the financing of terrorist activity is actually as great as it interest in maintaining a corruption free electoral process. 'The legitimacy of the objective of safe guarding our national security is "obvious and unarguable." ' " (p. 44). Our national interest is not protected by protecting a foreign terrorist state like Syria from those who would use force against it. The Assad regime is not a victim according to the kinds of victims listed in the legislative history. The "intimidation and coercion" punished by the enhancement is affirmative and unprovoked aggression against the United States or a friendly government, not against a terrorist state.

The Supreme Court holds that the prohibition against provision of material support to an FTO is justified because such support "furthers terrorism by straining the United States relationships with its **allies**." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33 (2010) (emphasis added). The legislation is not aimed at maintaining good relationships with enemy terrorist states such as Syria. As documented in section B.1 of the Sentence Memorandum, *infra,* the Bashir Al Assad regime is a terrorist state that is responsible for murdering its own people and citizens of the United States.

8

The material support statute prohibits "aid for foreign terrorist groups that harm the United States partners abroad ... moderate governments with which the United States has vigorously endeavored to maintain close and friendly relations." *Holder v. Humanitarian Law Project, supra*, at 32.

Furthermore , the legislation was not intended to punish efforts to combat "state sponsored terrorist actions", that practiced by the Bashir Al Assad regime. The legislation even authorizes lawsuits against such foreign terrorist governments. (*H.R. Rep, supra*, at 4), and "the Caesar Act" imposes sanctions specifically against Syria. See Sentence Memorandum, Section B.1*infra*. It would be contrary to this Congressional intent to increase the punishment for federal criminal offenses motivated by the fight against state sponsored terrorist action.

Mr. Rakhmatov will rightly be punished for the criminal offense he committed by giving monetary support to the ISIS terrorist organization. Penalties are set out in the statute for that offense, but a multifold increase in that punishment under the 3A1.4 enhancement because his purpose was to defend against state sponsored terrorism would be irrational, inhuman, contrary to the intent of the legislation, and unconstitutional. Mr. Rakhmatov is not asking for a pass on punishment for giving indirect monetary support to ISIS; he is asking only that that punishment not be disproportionally enhanced for his limited monetary contribution to the efforts  of a man who wanted to fight alongside ISIS to combat the much greater harm inflicted by the terrorist state of Syria.

9

2.   The Unfounded, Unsupported, and Unfair Nature of the Terrorist
     Enhancement

If the Court should find that the terms of USSG 3A1.4 apply to Mr.

Rakhmatov's offense, he urges the Court to exercise its discretion not to apply the

enhancement. *Kimbrough v. United States*, 552 U.S. 85 (2007), holds that the

Court has that discretion when it considers the Guideline unfair, unfounded, or

unsupported. USSG 3A1.4 is all of these, if its terms are read to apply, without

distinction, to the most violent acts as well as to the most minimal acts of providing

money support. Without application of the enhancement, Mr. Rakhmatov's

Guidelines for providing support to a terrorist organization would be 63-78 months

at Criminal History I, because he has no prior convictions. This was the sentence

that Congress intended for the basic offense of providing material support. Mr.

Rakhmatov's offense of making a small monetary contribution could not be

characterized as more than that basic offense. Even if two additional offense level

points are added because he had reason to believe that the money would be used by

someone who intended to possess a weapon (USSG 2M5.3(b)(1)(E)), the Guideline

would be 78-97 months. But, application of the terrorist enhancement adding 12

additional points and jumping his Criminal History I to Criminal History VI,

irrationally and arbitrarily renders his Guidelines 30 years to life.

The Sentence Commission provides no empirical support or rationale for

treating Mr. Rakhmatov's offense the same as that of a murderer or a Career

Offender, or a major drug dealer. He must be punished for his crime of making the

monetary contribution, not for setting bombs, or massacres of people or killing of

innocents. USSG 3A1.4 is a non-guideline Guideline: it gives no guidance and contains no standards by which a distinction should be made among those convicted of material support. Its application to Mr. Rakhmatov would result in a non-parsimonious sentence contrary to equal protection and due process of law (*Johnson v. United States*, 135 S.Ct. 2551 (2015)), and contrary to the proscriptions of 18 U.S.C. §3553(a) and the Supreme Court and Second Circuit cases that each individual's sentence must be based on his individual history and the individual nature of his offense. *United States v. Dorvee*, 616 F.3d 174, 184-88 (2d Cir. 2010). A District Court can "disagree with the weight the Guidelines assign to a factor." *United States v. Salim*, 690 F.3d 115, 126 (2d Cir. 2012).

3.   Compounding the Sentence for Both Terrorism and Assistance to Violence Would be Double Counting

The PSR applies both the 12 point terrorism enhancement of USSG 3A1.4(b) and the 2 point upward adjustment for "intent, knowledge or reasonable belief tha [material support] was to be used to commit or assist in the commission of a violent act" (USSG 2M5.3(b)(1)(E) (PSR at¶34). Mr. Rakhmatov's objection to the terrorism enhancement is argued, *supra*. If his arguments are overruled and that enhancement is nonetheless applied, it is submitted that the additional application of the violent act upward adjustment, would result in double counting. Rejection of defendant's arguments against the enhancement would render violent acts covered by the enhancement.

Impermissible double counting occurs when the same conduct, which constitutes an element of the offense of conviction or some other sentence

11

enhancement is counted again to increase the sentence even more. *United States v. Hunter*, 795 Fed. Appx. 75, (2d Cir. 2020); *United States v. Maloney*, 406 F.3d 149 (2d Cir. 2005); *United States v. Anglin*, 169 F.3d 154 (2d Cir. 1999). In this case, the Court's ruling applying the enhancement on the grounds of commission of a terrorist crime of "intimidation or coercion" (18 U.S.C. §2332b(g)(5)(A)) would be, in effect, a ruling of the commission of violence. It is submitted that the defendant's sentence should not be increased further for the same conduct, and that to do so would deprive him of due process of law and contravene 18 U.S.C. §3553(a).

Even if the Court declines to apply the terrorist enhancement, defendant objects to imposition of the upward adjustment. When he provided his material support for Saidakhmatov's travel to Syria, he had reason to believe that Saidakhmatov intended to possess a weapon there. Possession of a weapon is not a crime of violence  18 U.S.C. §16*; United States v. Gamez*, 577 F.3d 394 (2d Cir. 2009); *United States v. Soto-Rivera*, 811 F.3d (1st Cir. 2016); *United States v. Rollins*, 836 F.3d 737 (7th Cir. 2016), and Mr. Rakhmatov's general purpose to help in the self-defense of victims of the Assad regime was not a violent act itself; his money contribution was too remote from any act of violence, and any violence in self-defense against an oppressive murderous regime is not the violence the terrorist upward adjustment was meant to punish.

4.   Other Objections to the PSR

A.   Mr. Rakhmatov denies that he had the conversation alleged by Mr. Habibov in paragraph 20, p.9 of the Report

B.   Mr. Rakhmatov objects to the Report's characterizations of him as "an ISIS supporter and sympathizer" and that he "conspired" to "fight in a violent jihad." ¶25, p. 11. Other than his support for Saidakhmetov's efforts to join ISIS to fight against Bashir Al Assad and his donations to other unspecified charities, Mr. Rakhmatov did not support or sympathize with ISIS, its ideology or its acts. See the Sentencing Memorandum.

C.   The PSR is mistaken that Mr. Rakhmatov's mother "was never employed outside of the home." ¶50, p. 14. In fact, she worked as an accountant for Uzbeki government and private agencies.. Ex.2.

D.   Mr. Rakhmatov denies that "the ex wife never forgave him for deciding to end the marriage while she was pregnant." ¶ 52, p. 14. The decision to end the marriage was mutual, therefore his ex-wife has no reason to blame him for its timing.

E.   Mr. Rakhmatov's wife and two children, who are on public assistance, have moved from an apartment to a shelter for a year and back to an apartment, therefore Mr. Rakhmatov did not recall her last address during the Presentence Interview. ¶49, p. 13; ¶ 59, p. 15. He did remember the phone number, ███████████, and gave it to the Probation Officer at the interview. The phone has been continuously connected, but Ms. Kone has

13

not been contacted. Her address is

████████████████ ██████████████████ Her letter to the Court is

Exhibit 16 hereto. Also, public assistance has not been enough to sustain his

wife and children, and Mr. Rakhmatov has borrowed money and sent it to

her.

F.    Mr. Rakhmatov's English is excellent.

## SENTENCE MEMORANDUM

1.  Guideline Downward Departure and Sentence Based on the §3553(a) Factors

   A.    Departures

The automatic fictional imposition on Mr. Rakhmatov, who has no criminal

history, of the same criminal history as that of a serial killer or Career Criminal is

arbitrary and unjustifiable, and the Court is urged to downwardly depart on the

grounds that the 3A1.5 designation overrepresents the seriousness of his criminal

history and the likelihood that he will commit other crimes." USSG 4A1.3(b)(1).

His offense is simply not within the heartland of cases envisioned by the

Guidelines. See section B, infra.

Mr. Rakhmatov has no criminal record. As detailed further *infra*, he worked

hard at various legitimate jobs as an engineer and jewelry maker in Uzbekistan, and

as a jewelry maker and buyer and seller of used cars in the United States. He is

married and had supported his wife and his two American born children before his

arrest. There is no violence in the commission of his offense. His small, individual

money contributions to what he believed would be the defense against an

14

oppressive outlaw regime should not be punished as if its seriousness equaled

murder and wanton killing. He must be punished for contributing to an

organization that has otherwise used terrorist violence, but his punishment must be

calibrated to the degree of the gravity, the seriousness of his individual acts. 18

U.S.C. §3553a. There is nothing in his background to evidence an intention to

commit other crimes, let alone terrorism. See Sageman Report, Ex. 18 . The

government surveilled him for over a year after the arrests of the other four

defendants in the case; he committed no criminal acts during that year. The

government has no evidence of criminal acts at any other times other than his

minimal sporadic monetary contributions during the two years before his co-

defendants' arrests.

The Second Circuit, in a situation analogous to this case, has overturned a

sentence which applied an automatic Guideline enhancement to a defendant who

did not merit the most dangerous categorization. *United States v. Dorvee, supra*.

> Consequently, adherence to the Guidelines results in
> virtually no distinction between the sentences for
> defendants like Dorvee, and the sentences for the most
> dangerous offenders who, for example, distribute child
> pornography for pecuniary gain and who fall in higher
> criminal history categories. This result is fundamentally
> incompatible with §3553(a). By concentrating all
> offenders at or near the statutory maximum, §2G2.2
> eviscerates the fundamental statutory requirement in
> §3553(a) that district courts consider "the nature and
> circumstances of the offense and the history and
> characteristics of the defendant" and violates the
> principle, reinforced in *Gall*, that courts must guard
> against unwanted similarities among sentences for
> defendants who have been found guilty of dissimilar
> conduct. *See Gall*, 552 U.S. at 55, 128 S.Ct. 586

15

> (affirming a sentence where "it is perfectly clear that the
> District Judge considered the need to avoid unwarranted
> disparities, but also considered the need to avoid
> unwarranted similarities among other co-conspirators
> who were not similarly situated" (emphasis in original)).

616 F.3d at 187. The Circuit's holding that the application of the enhancement,

*albeit* in a child pornography case, was unreasonable, applies equally in this case,

as does its directive to District Judges encouraging them to exercise discretion to

avoid application of Guideline enhancements which do not take into account the

individual defendant in favor of empirically unsupported automatic enhancements

> District judges are encouraged to take seriously the broad
> discretion they possess in fashioning sentences under
> §2G2.2—ones that can range from non-custodial
> sentences to the statutory maximum—bearing in mind
> that they are dealing with an eccentric Guideline of highly
> unusual provenance which, unless carefully applied, can
> easily generate unreasonable results. While we recognize
> that enforcing federal prohibitions on child pornography
> is of the utmost importance, it would be manifestly unjust
> to let Dorvee's sentence stand. We conclude that Dorvee's
> sentence was substantively unreasonable and,
> accordingly, must be revisited by the district court on
> remand.

*Id* at 188.

District Courts have followed these admonitions and reasoning and have

declined to apply the terrorist enhancement of 3A1.5 or have downwardly departed.

*United States v. Alhaggogi*, 372 F.Supp. 3d 1005 (N.D. Cal. 2019) (downward

departure from 3A1.5 for defendant convicted of providing material support,

possession of device making equipment, using an unauthorized access devices, and

aggravated identity theft); *United States v. Naygar*, 2013 WL 2436564 (S.D.N.Y.

16

2013) (Sweet, J.) (downward departure from 3A1.5 for defendant convicted of providing material support and for trafficking in firearms and providing an FTO with guns, vehicles, ammunition, bullet proof vests); *United States v. Muhtorov*, 329 F.Supp. 3d 1289 (D. Colorado 2018) (downward departure for defendant convicted of providing medical support including himself as a personnel and who encouraged others to support the FTO to which he swore allegiance);

> The automatic assignment of a defendant to a Criminal History VI is not only too blunt an instrument to have genuine analytical value, it is fundamentally at odds with the design of the Guidelines. It can, as it does in this case, import a fiction into the calculus. It would impute to a defendant, who had no criminal history, a fictional history of the the highest level of seriousness.

*United States v. Jumaev*, 2018 WL 3490886*8 (D. Colorado 2018) citing *United States v. Mchanna*, No.1:09-cr-10017-GAO (D. Miss. April 12, 2012), sentencing transcript at 69:14-24, ECF No. 439.

These departures referred to both the automatic Criminal History Category enhancement, and also to the automatic twelve point offense level enhancement of USSG 3A1.5. *United States v. Nayyar, supra* at *8 ("application of the terrorist enhancement to the calculation of Nayyar's offense level has the effect of obscuring the difference between Nayyar's offense, which did not result in any actual harm, and an instance where such conduct did result in actual harm ... A Similar inequitable result would obtain if the Terrorist Enhancement were applied to increase Nayyar's Criminal History Category").

A downward departure is additionally sought on the grounds that Mr. Rakhmatov's offense was aberrant behavior according to USSG 5K2.20 and intended to avert perceived greater harm under 5K2.1. Aside from the $400 contribution to ISIS, Mr. Rakhmatov's life has been an exemplary one of hard study, hard work, and talented art (See details, *infra*). Although he did make periodic small contributions to help fighters in Syria against Assad, the $400 contribution, which constituted his offense conduct, and was situationally motivated in part by his Iphone purchases in that amount, was the only contribution he knowingly made to ISIS. These contributions were motivated by Mr. Rakhmatov's desire to defend against the massacres of the Assad regime, not to harm innocent people in the United States. *United States v. Patterson,* 281 F. Supp.2d 623 (E.D.N.Y. 2003) (Weinstein, J.); *United States v. DeRusse*, 859 F.3d 1232 (10th Cir. 2017); *United States v. Germosen*, 473 F.Supp.2d 221 (D. Mass. 2007).

B.    §3553(a)

The Second Circuit holds that the Guidelines are not the standard of reasonableness of sentences. Rather, "we have used as our lodestar the parsimony clause of 18 U.S.C. § 3553(a), which directs sentencing courts to 'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2). United States v. Dorvee, 616 F. 3d 174, 183 (2d Cir. 2010). Those factors are, broadly speaking, proportionality, deterrence,

18

incapacitation, and rehabilitation." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013).

Section 3553(a)(1-7) lists the factors on which a sentencing court is required to specifically focus its attention. These are, in relevant part, the nature and circumstances of the offense and the history and character of the defendant; the need for the sentence imposed; the kinds of sentences available; the sentencing range established by the Guidelines; and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. §3553(a)(6). Mr. Rakhmatov submits that, given each of these factors in his case, the most parsimonious sentence is the basic Guideline sentence of 63-78 months at the base offense level 26 without enhancement, and at Criminal History Category I.

(1)    Influences on Mr. Rakhmatov's Character That Motivated His Intent to Contribute to Saidakhmetov's Travel to Join ISIS

The United States government designates the government of Bashir Al Assad of Syria "a State Sponsor of Terrorism." https://www.State.gov/reports/country-reports-on-terrorism-2019/syria/

The regime of Bashir Al Assad's war against the Syrian population, three quarters Muslim, officially began in 2011, and it is estimated that since then the regime has killed 500,000 people, and that half of the 20 million inhabitants have fled the country. *The New York Times*, 12/5/19 at p. A6. The President of the United States signed into law in 2019, the Ceasar Syria Civilian Protection Act, which is named after a Syrian photographer who shared with the world thousands

19

of photographs he took of torture in Bashir Al Assad's prisons. The Act imposes financial sanctions on individuals and companies who assist the regime in the use of the international financial system and the global supply chain to continue to brutalize the Syrian people. https://www.state.gov/caesar-syria-civilian-protection-act/

Physicians for Human Rights reports that since 2011, the regime has bombed 595 hospitals, clinics and medical personnel in Syria. *The New York Times*, 4-7-2020, p. A.19. According to Physicians for Human Rights, and the United Nations Commission of Inquiry, anyone in Syria providing medical assistance to those considered enemies of the regime are prosecuted without lawyers in secret courts, and imprisoned and tortured. *The New York Times*, 12-5-19, at p. 6.

Secretary of State Mike Pompeo announced in September, 2019, that the United States has concluded that the Al Assad regime used chorine gas on its enemies in May, 2019, and that this was the latest in a series of banned chemical weapons attacks used by Assad, including sarin gas, which provoked a missile strike by the United States on a Syrian airbase in April, 2017. In April, 2018, the regime killed 40 people in a chemical attack, in retaliation for which, combined forces of the United States, Britain, and France launched strikes against Syrian chemical weapons storage facilities. Secretary Pompeo said that the United Stares is "going to do everything we can reasonably do to prevent that kind of thing from happening again." *The New York Times*, 9-26-19, https://www.nytimes.com/2019/09/26/world/middleeast/syria-chemical-weapons-us.html

20

At least four federal District Court Judges have held Bashir Al Assad's regime responsible for the deaths of several American citizens killed in terrorist attacks sponsored in one way or another by the regime. *Colvin v. Syrian Arab Republic*, 363 F.Supp.3d 141 (D.D.C. 2018); *Foley v. Syrian Arab Republic*, 249 F.Supp.3d 186 (D.D.C. 2017); *Thuneibat v. Syrian Arab Republic*, 167 F.Supp.3d 22 (D.D.C. 2016); *Gates v. Syrian Arab Republic*, 580 F.Supp.2d 53 (D.D.C. 2011).

Dr. Adeeb Khalid, Professor of Asian Studies and History, in an analysis provided for this case reports,

> The Syrian civil war was seen by many Muslims around the world as the assault of a dictatorial regime on innocent Muslims. It became a *cause célèbre* especially among Muslims living in Europe and North America, who saw the struggle against the Syrian regime of Bashar al-Assad was a "just war" to stop the slaughter of innocents by a vile regime. Images of the war were shared widely on social media and on the internet ...
>
> . . .
>
> Mr. Rakhmatov was part of this broad phenomenon of global Muslim sympathy for Assad's victims. Coming from Uzbekistan, where expression of Islam had been tightly controlled, and having the burden of thinking that one had not been a "good Muslim" until recently, the impulse to help pious Muslims being gunned down by a vile regime was strong. Moreover, his support was directed against the Assad regime, not the United States.

Khalid, Report, Ex. 3 at pp. 7-8. Dr. Khalid reports that "social media appeals and raw emotional videos on YouTube moved many people, especially Muslims to act. Massive fundraising efforts commenced to help the victims of the war. Many saw

contributing monetarily to the war and its victims as a pious deed, and not an act of terror." *Id.* at 8.

Dr. Khalid also identifies the Islamic-Uzbeki religious-cultural prescription for charity and its proscription agains the unpaid debt as influences on Mr. Rakhmatov's behavior. He concludes from the documents he reviewed in the case that

> "Mr. Rakhmatov was indebted to Abror Habibov, who allowed Mr. Rakhmatov to use Habibov's licenses to sell items from kiosks in malls in New York and Connecticut. Mr. Rakhmatov also looked to Habibov for advice in business dealings, such as buying used cars to rent to Uber drivers. Mr. Rakhmatov's payment of $400 to Akmal Zakirov was connected with these business entanglements. This is evident in the log of his intercepted conversations with his colleagues. During the telephone conversation of February 7, 2015, with Abror Habibov, Mr. Rakhmatov is clearly ordering two iPhones at $400, and the $400 payment was tied in part to that transaction and his desire to pay off amounts owed as speedily as possible, as well to his intent to aid the travel of the man to Syria to join ISIS."

*Id* at 8-9.

These views are further supported by the Report of Dr. Marc Sageman, paychiatrist and terrorism expert ( See his report and resume, Ex. 18), who interviewed Mr. Rakhmatov, and examined his background, and this case, and the conclusions from research studies, including, for example, the study conducted by the International Center for the Study of Violent Extremism, reported on May 12, 2020, in *Homeland Security Today.US.* hstoday.us/subject-matter-areas/counterterrorism/how-assads-atrocities-became-a-powerful-motivator-for-

terrorist-recruitment/   The report is also found on the ICSVE website at

https://www.icsve.org/how-assads-atrocities-became-a-powerful-motivator-

for-terrorist-recruitment/

Having interviewed 239 returned ISIS volunteers from Syria, people who

had gone far beyond Mr. Rakhmatov's contribution of a few hundred dollars to

help another person go there to fight, the authors of the study concluded

> Foreign fighters who traveled to ISIS were often motivated to
> do so by anger and sadness over Assad's atrocities toward his
> own people rather than affinity to ISIS's goals per se, as
> evidenced in this sample's responses, particularly among those
> who came early to the conflict zone.

ICSVE website, *supra* at 12. ". . . A deep hatred of Assad formed the primary

backbone for many ISIS cadres willingness to fight." *Id* at 16.

Mr. Rakhmatov's admitted intent to contribute to Saidakhmetov's  travel to

Syria to fight with ISIS was underpinned by the mixture of motivations described,

none of which were to do damage to the United States or its citizens or to support

offensive acts against anyone. See the Sageman Report and Mr. Rakhmatov's letter

to the Court, *infra.* They should be taken into account as mandated by 18 U.S.C.

§3553(a).

(2)    Mr. Rakhmatov's Background, the Offense, and the Most Parsimonious
       Sentence

   (a)    Background

The offense, a contribution of $400, was non-violent and did not involve a

specific plan to engage in a criminal act, let alone a terrorist act or any act  at all

against the United States.  It was not motivated by bad will against the United

23

States or an ideological or religious crusade against the United States or its citizens, or the citizens of Syria. It was a knowing contribution to ISIS, however, a crime that requires punishment, but for which Congress has seen fit to provide a whole range of permissible sentences between 0 and 15 years. The nature if this offense and Mr. Rakhmatov's exemplary background should not require more than the middle ground of the basic Guideline sentence of 63-78 months to accomplish the parsimony of §3553(a).

Mr. Rakhmatov grew up in a middle class, largely non-practicing Muslim household in Tashkent, the capital of Uzbekistan. He attained a university degree in gas and oil management. He excelled at art, studied jewelry-making and conducted his own business selling his hand-made pieces. He has continued making art while in prison. He makes extraordinary pop-up cards which open to reveal complex, beautiful three dimensional designs of flowers, birds, and symbols. He draws free hand, designs and cuts the cards by hand from construction paper, including the intricate internal structures that pop up when the card is opened. See page 31A and following, *infra*, and Exhibit 4. His jewelry-making business in Uzbekistan paid for his university education.

Mr. Rakhmatov's father drives a truck and bought and sold cars, the business which Mr. Rakhmatov was carrying on in this country prior to his arrest. He is very close to his father, who took Mr. Rakhmatov even as a child to his jobs and social gatherings and always treated him like one of the boys. Mr. Rakhmatov's mother was educated and a became an official in the Finance Ministry of Uzbekistan,

24

before settling down to raise her children. Mr. Rakhmatov's record is one of hard work, study and creating art in a healthy family. It is devoid of religious fundamentalism and criminality of any kind.

After his marriage to his first wife ended in divorce, and his jewelry business hit hard times, Mr. Rakhmatov came to the United States on a tourist visa in 2009 or 2010. He came again in 2010-2011 and took various jobs as a gas station attendant, mover and dishwasher. He rented a room in Brooklyn in a house where Abror Habibov lived and Akmal Zakirov visited Habibov. Habibov and Zakirov found Rakhmatov employment selling sunglasses, T-shirts, and I-phones at kiosks in shopping malls in Syracuse, New York and Middlebury, Connecticut. When he had no other place to sleep, Mr. Rakhmatov slept in the local mosque. One night, when Abibata Kone was visiting the mosque with her mother, someone crashed a car into her mother's car in the car parking lot. Mr. Rakhmatov saw the accident and offered his car to take them home. One year later in 2013, he and Ms. Kone married and moved into an apartment together. On the follwing page 25A is a photograph of Mr. Rakhmatov, his wife, and one of their two children.

Mr. Rakhmatov opened his own kiosk under someone else's license in the Syracuse Mall in 2013 to take advantage of the Christmas season, and thereafter started buying and selling cars. During the December, 2014 Christmas season, Mr. Habibov allowed him to use Habibov's license to operate two kiosks for Habibov's company in Malls in Connecticut where Mr. Rakhmatov moved. See the lease documents, Ex. 5.



25A

(b) The Offense

On February 7, 2015, Mr. Rakhmatov and Abror  Habibov had a long 20 minute conversation in which Mr. Rakhmatov sought advice from Mr. Habibov about how to buy used cars to rent to Uber drivers and about the purchase of used I-phones from Mr. Habibov for $400 for resale. On February 15, Habibov called Rakhmatov to remind him to try and collect as much as $2000 for another person's trip over there to "join."  Mr. Rakhmatov resisted, because he assumed that expenses would be taken care of when the person arrived, and because neither he nor his friends had money. Habibov persisted, and Rakhmatov agreed to try and collect some money. Habibov called again that day to urge Rakhmatov to call another person for contributions. Rakhmatov refused and told Habibov to do it, but to be careful talking on the phone because two apparently strange men had visited making inquiries. Habivov testified at Kasmov's trial that he was afraid the Uzbeki government would discover his plan and take action against him. (*United States v. Kasimov*, Ex. 6). On February 24, responding to Habibov's text, Rakhmatov called him. Habibov asked Rakhmatov to provide $300 for the trip, and he agreed. Habibov then repeated that the traveler needed $2000 and Rakhmatov again resisted the need for so much money. Habibov replied that $1000 was needed for a "pencil," meaning a weapon. Rakhmatov suggested he could raise $200 and deposit it in Zakirov's account. Later that day, he deposited $400, the cost of the Iphones he was seeking to buy from Habibov for resale.

26

Over the next two days, February 25 and 26, 2015, all of the participants in the effort to help Saidakhmatov travel to Syria, except for Mr. Rakhmatov, were arrested. Mr. Rakhmatov was not arrested until a year and a half later, on May 11, 2016, during which year and a half he was visited and surveilled by the government. As in his life before the $400 contribution, his life during the succeeding year and a half was devoid of criminal acts or other contributions to ISIS or any acts related to a terrorist organization. The $400 contribution was his only known contribution to ISIS; his small money donations during the two years prior thereto to help the fight against Assad were in response to charitable elicitations at the mosque, and among his community of Uzbeki Muslims, and not specifically earmarked for ISIS. Habibov's telephone was wiretapped during those two years and no conversations of Rakhmatov about contributions or other crimes were discovered.

(c) Good Works and Commendations in Prison

In the nearly four years of his imprisonment after his arrest, Mr. Rakhmatov has continued his lifestyle of hard work, art, and helping others at the Metropolitan Correctional Center (MCC). "Mr. Rakhmatov worked as an inmate companion from 12-6-18 to 4-4-19. During the time working as an inmate companion, he was responsible for maintaining constant monitoring of inmates on Suicide Watch and/or psychological observation, openly communicating with the staff about the observations and any related concerns and keeping appropriate documentation ... He maintained a pleasant attitude throughout his period of

27

employment, was communicative about any problems or issues related to his participation in the program ... he was a helpful member of the inmate companion program." J. Avena, PsyD, Mary 3, 2019, Ex. 7. He continued to work in the inmate companion unit for fifteen months.

"Mr. Rakhmatov has been selected as the Unit Orderly, Maintenance Detail. In his position, he has contributed a positive spin on the Unit Orderly Team with his consistent display of superior work ethics, great communication skills, and he is a great team-player. He is proactive, and faces his challenges of his environment with grace and integrity." L. McPherson-Anderson, Correctional Counselor, February 23, 2018, (Ex. 8). "Inmate Rakhmatov is an outstanding worker. He keeps his work area clean, sanitized and organized at all times as well as volunteering to help out anywhere in the kitchen as needed without any questions asked: I recommend $9.60 bonus." Work Performance Rating, Food Service, supervisor's signature illegible, March 30, 2017.

Correctional Counselor Dion Rivera writes directly to the Court in a letter dated October 28, 2019:

> "Please be advised that Mr. Rakhmator, Azizjon has been at the Metropolitan Correctional Center, for approximately three years and 5 months. During his time here at MCC he has been a model inmate and has no incident report history. He has also works [sic] within the institution Food Service Department and Suicide Watch since October 19, 2018, with a work performance history of outstanding. Mr. Rakhmatov has completed courses on Drug Program, Commercial Driving License Prep, Money Smart, Drama, Leadership and Influence, Time Management, Conflict Resolution, Inside out Parenting, Reflection, Led by Example and Focus Forward during

28

his time here. He has shown commitment in utilizing his incarceration for a positive future outlook in. life. If you have any questions please do not hesitate to contact me."

Ex. 9.

The Focus Forward Project provides educational programming to federal pre-trial inmates. Two of the class Facilitators write of Mr. Rakhmatov's in a letter to the Court dated October 2, 2017:

> Aziz was one of the first participants to share with the group. He overcame a language barrier and shyness to engage with us in dissecting chapters of *A long Way Way Gone*. We noticed his timely submission of classwork and attention to detail in his journal assignments. Aziz's conscientiousness became apparent in all that he applied himself to throughout the twelve weeks.
> Hardly ever missing a class, we came to view Aziz as one of the
>
> most reliable participants. In fact, other participants would mention to us that Aziz would frequently check in with others throughout the week to ask if class would still be on and if there was any change or cancellation. We knew he valued the class time, and we looked forward to his enthusiasm each week.
>
> Public speaking was perhaps Aziz's biggest challenge. Prior to the first round of speeches, he expressed his nervousness to us and asked to go last. But, once it was his turn, he bravely presented on his topic and received positive and constructive feedback graciously. Though we suspected the nervousness did not completely go away, Aziz carried himself with confidence for the second speech. We were impressed with his determination to do something that may not have been his strength. This kind of tenacity is very characteristic of Aziz, and serves him well.
>
> We feel fortunate to have gotten to know Aziz during our course, and are happy to remain supportive and do whatever we can to help him going forward. Our aim is to give you a view of Aziz as we came to know him after spending these twelve weeks in class together. We

29

appreciate the time Your Honor has taken to read our letter. If you have any questions, please feel free to contact either of us directly at the numbers listed below.

Caitlin Parker amd Eleni Konstantopoulos, Ex 10.

Mr. Rakhmatov completed fourteen educational and training courses while working in the kitchen and making his art.  Ex. 11.

Two chaplains at MDC have written on Mr. Rakhmatov's behalf. Chaplain Steve Mun writes that "Mr. Rakhmatov was the inmate speaker selected among 800 for the MCC New York Volunteer Banquet in 2018 (see photograph on page 30A following).

The Religious Services Department sees Mr. Rakhmatov as a positive model for other inmates and prays that he continues to strive for excellence in faith." Letter, Chaplain Steve Mun, December 8, 2019, Ex. 12.  The Supervisory Chaplain at MCC writes that Mr. Rakhmatov is "very patient, consistent, respectful and ready to assist ... he discharges commendably" leadership of the Muslim Friday Jumah Services in absence of the Chaplain. Letter of Supervisory Chaplain, Z. Yousif, September 9, 2019, Ex. 13.

Even fellow inmates have chosen to write about his good works in prison. One writes that Mr. Rakhmatov gave an almost new pair of sneakers to another inmate on Suicide Watch, gave food to others, and was the only one on Suicide Watch who could calm down an unmanageable inmate. Letter of Denver McFadden, Ex. 14. Another inmate writes that Mr. Rakhmatov saved him from committing suicide, Letter of Michael Lamar, October 16, 2018, Ex. 14.

30



30A

It is difficult in print and photograph to capture the beauty, creativity, careful detail and disciplined meticulous craftsmanship of his art. Some copies of his drawings and cutouts are included as Exhibit 4 attached hereto. Photographs of two of his popup art cards are included here on page 31 A and following).

Attached are several letters from his mother, father, brother, a cousin and friends from Uzbekistan, all of whom attest to his good character. The original letters were written in Uzbek; the translations are included as Ex. 15. Videos made by his family in Uzbekistan will be sent under separate cover. His wife, a 25 year old woman who was born in West Africa, has written a letter in English filled with detail about Mr. Rakhmatov's care for her and others. She writes that she had refused his proposal for marriage, "because he is too nice, I didn't wanted [sic] to get married to someone who soft hearted with everyone even people are mean to him, for him he doesn't see it." She writes that her mother talked her into accepting the proposal, because, "in this world I would never find a man like him who is so generous with everyone always at the forefront and help everyone, he befriending anyone that he see." When her mother divorced, he insisted she come and live with them and refused money for rent. When she was pregnant and could only eat McDonalds burgers with french fries, food that Mr. Rakhmatov abhors, he brought them to her everyday.

> There not enough word in this world to describe how good of person he is to anyone he met. Never, never ever since I had met him to known of had hating anyone because of their religion and my husband worked at the mall he interacted every single day with people who doesn't share same faith with him. My husband accept



31A



318



31C



31 D



31E



31F



31G

> people with different religion. I have never known him to
> be a cheater nor have he ever been known to anyone to
> have hate toward anyone. My husband came to this
> country for the freedom this country promise, for
> opportunity, to gain something and take care of his family
> that in Uzbekistan and his 7 years old daughter has well.
> My husband never treats anyone bad, even if you're not a
> Muslim, he believe every human being is from Adam we
> are brother and sisters no matter what your color and your
> status in this life is. '
> statues [sic]

Letter of Abibate Kone, Ex. 16.

Thus, given the range of offenses covered by the crime of "provision of material support" and the available sentences for such offenses, anywhere from no imprisonment to fifteen years imprisonment, given Mr. Rakhmatov's non-violent and singular monetary contribution in the context of an otherwise law-abiding creative, and family life devoid of ideology or religious commitment to violence or harm against others, the four years of demonstrated dedication to work and caring for others in prison, and the mixed motive of satisfying an employer from whom he was purchasing Iphones for the exact amount of his contribution, his sentence should be in the lowest range of the penalty structure.

(3)    The Need for the Sentence Imposed

The government has stated its intention to seek the maximum sentence of 15 years for Mr. Rakhmatov's non-violent contribution of $400 to send a man to Syria, notwithstanding that the same prosecutor asked for a 3 year sentence for Imran Rabbani, the man who helped build a pressure cooker bomb for an ISIS attack *in the United States*, who attacked a federal agent with a knife *in the United*

32

*States*, and who stole $3500 from his employer by writing and cashing bad checks. The government argued that the 3 year sentence satisfied the §3553(a) factors for the man of whom it said, "the underlying facts demonstrate that the defendant's conduct was significantly more dangerous than the minimal conduct required to support a conviction for the charged offense [providing material support to a foreign terrorist organization] ... the context of the defendant's pro-ISIS rhetoric and eagerness to participate in future meetings with Mumuni and Seleh who were plotting a domestic terror attack in support of ISIS, the record establishes that the defendant failed to engage in truly catastrophic action only because of continued government intervention." *United States v. John Doe* (*Imran Rabbani*), docket number 15-302 (MKB), government sentence record memorandum, August 3, 2016, at pages 8-9, attached hereto as Exhibit 17. Rabbani was sentenced to 18 months imprisonment.

On all accounts, Mr. Rakhmatov's offense is far less serious than Rabbani's therefore the government's call for a quintupling of Rabbani's sentence for Mr. Rakhmatov is disparity run amok. Rabbani did cooperate, but Mr. Rakhmatov does not deserve a five times greater sentence because he was such a minor offender that he had no substantial information to offer the government. Even if Mr. Rakhmatov's sentence must be increased because he did not cooperate, it could be doubled or tripled to 6 or 9 years and not approach the arbitrary unjust sentence of 15 years sought by the government.

The sentence of 36 months for Rabbani, despite his violence, was advocated by the government as sufficient to reflect the seriousness of his offenses, the need to protect the public, and to deter others. 18 U.S.C. §3553(a). If sufficient for those purposes in Rabbani's case, anything more than the basic Guideline sentence of 63-78 months for Mr. Rakhmatov, would violate the prescription of the parsimony clause and the proscription against unwanted sentence disparities of §3553, as well as due process of law, especially given Mr. Rakhmatov's non-violence, the far less serious nature of his offense, his expression of regret for his action, his non-ideological motivations, and his background of family and good works before and during his imprisonment. A 15 year sentence, or any sentence above 63-78 months would be "staggeringly" disproportionate. *United States v. Ben Kahla*, 501 F.Supp.2d 748, 762 (E.D.N.Y. 2007)).

In this case, the Court has already sentenced Abdurasol Juraboev and Akhror Saidakhmetov each to 15 years imprisonment, for conduct more serious than Mr. Rakhmatov's. Both men planned to travel to Syria, and expressed fanatical ideologies of hate, and Mr. Saidakhmetov was about to board the plane when he was arrested. Mr. Juraboev apparently threatened to kill the President. In comparison, Mr. Rakhmatov's conduct is much less severe, and he has expressed no desire or intent to harm anyone. Around the country, small money contributors convicted of providing material support have received sentences around five years, and at most up to ten. *United States v. Hodzic*, 4:15-cr-00049 (E.D. Mo. 2015)($700 contribution, 5 years imprisonment); *United States v. Mihalik*, 2:11-cr-

34

00833 (C.D. Cal. 2011)($2000, 60 months); *United States v. Akl*, 10 cr. 251 (N.D. Ohio) (attempt to hide $500,000, two defendants, 40 months and 75 months); *United States v. Maolin (Mohammed)*, 10 cr. 04246 (S.D. Cal. 2010) ($1000, 72 months); *United States v. Khan*, 10 cr. 240 (N.D. Ill.)($1500, 90 months); *United States v. Kooremi*, 3 Cr. 83030 (E.D. Mich.)(54 months); *United States v. Yusuf*, 10 cr. 04551 (S.D. Cal. 2010)($1450, and recruitment, 96 months); *United States v. Natsheh*, 16 cr. 166 (N.D. Cal.)(60 months); *United States v. Jumaev, supra* ($300, 76 months; See review therein of similar cases and sentences).

Even those who have committed far more serious terrorism related offenses have been given sentences significantly less that 15 years. Judge Weinstein sentenced a man who had spent six months engaged directly with ISIS in weapons, explosives, and battle training overseas, and who returned to the United States and exchanged substantial information for leniency, to 2 years imprisonment. The Judge quoted data from a George Washington University Program on Extremism that the average sentence for non-cooperating returnees from jihadist activity in Syria and Iraq was 10 years. *United States v. John Doe*, 14 Cr. 00612-001 (E.D.N.Y. August 6, 2018)(Weinstein, J.).

Judge Dearie sentenced a man who was the chief procurement officer for a foreign terrorist organization to 9 years in prison. *United States v. Thavaraja*, 17 cr. 20781 (E.D.N.Y.); In *United States v. Ahed*, 10 cr. 131 (S.D.N.Y.), the defendant pled guilty to giving money, receiving bomb making instructions and attempting to obtain grenades, and was sentenced to 63 months. A man who had attended

training camps was sentenced to 8.5 years in *United States v. Al-Marri*, 7 cr. 10030 (C.D. Ill.); the defendant in *United States v. Conley*, 14 cr. 163 (D. Colo.) received 4 years for supporting jihad and attempting to travel to join a foreign terrorist organization. In *United States v. Daniels*, 2-16-cr-222-01 (S.D. Ohio), the defendant contributed $250 and bought a plane ticket to attend a training camp; he was sentenced to 80 months imprisonment. In *United States v. El Gamal*, 15 cr. 000588 (S.D.N.Y. 2019), the defendant was sentenced, after trial, to 12 years imprisonment for engaging in actual military training. In *United States v. Ahmed*, 10 cr. 131 (S.D.N.Y. 2013), the defendant was sentenced to 9.25 years for contributing 2000 Euros, attending training camps, and getting bomb making instructions.

The Center on National Security at Fordham Law School has published a study of "Case by Case: ISIS Prosecutions in the United States March 1, 2014-June 30, 2016." The average sentence for all ISIS related crimes was 9.2 years. *https://static1.squarespace.com/static/55dc76f7e4b013c872183feat/577c5b43197a ea832bd486c0/1467767622315/ISIS+Report+-+case+by+Case+-+July2016.pdf*

It is submitted that a sentence of 15 years for Mr. Rakhmatov would be disparate and unwarranted 18 U.S.C. §3553(a)(6).

(4)    The Kinds of Sentences Available, Including the Nature of the
       Punishments Already Received and Yet to Come

Mr. Rakhmatov has already been imprisoned for four years at the Metropolitan Correctional Center in Manhattan, a jail designed to hold short term pre-trial detainees and apparently not equipped to handle the high traffic, and the

high publicity cases now thrust upon it, to provide the space and cleanliness, food and heat, orderliness, and medical treatment for long-term confinement exacerbating the physical and psychological pressures of Mr. Rakhmatov's long-term confinement there. The prisoners at MCC are frequently locked in their cells for 24 hours for days at a time without heat and hot food due to various disturbances. "Metropolitan Correctional Center on Lockdown for Sixth Straight Day", New York Post, 3-3-2020.

https://nypost.com/2020/03/03/metropolitan-correctional-center-on-lockdown-for-sixth-straight-day/

"Stop Searches, Frozen Bologna Sandwiches and Wrecked Cells: MCC Inmates Detail Lockdown Due to Smuggled Gun."  New York Daily News, March 6, 2020.

https://www.nydailynews.com/new-york/ny-mcc-lockdown-accounts-20200306-aws7qoa7ejcozai3i64hms73qi-story.html

"Manhattan Jail That Holds El Chapo is Called far Tougher Than Guantimano Bay." New York Times, January 23, 2017.

https://www.nytimes.com/2017/01/23/nyregion/el-chapo-guzman-manhattan-jail.html?searchResultPosition=2

"I wanted to Tell the World About Epstein's Jail. No One Wanted to Listen. The Metropolitan Correctional Center Has Become Notorious for Decades of Inhuman Treatment." The Atlantic, August 16, 2019. https://www.theatlantic.com/ideas/archicve/2019/08/real-scandal-mcc/596257/

During the four years of his hardship imprisonment at the MCC, Mr. Rakhmatov has had to sleep without a pillow, has often been freezing cold with only a thin cloth to cover himself, has regularly seen mice and bugs in his sell and elsewhere, has waited months for medical help for blocked sinuses and dental work that has left him in pain in a tooth that was supposed to be painless after root canal ordered by the Court, and hundreds of dollars of his personal property and all of his legal papers and discovery cd's taken from him and never returned. He has not received mail sent and even delivered by his lawyer and mail sent by his wife, and she in turn, has not received mail sent to her by him

The Second Circuit acknowledges that harsh prison conditions are a factor to be considered in arriving at a parsimonious sentence under §3553(a)(*United States v. Rodriquez*, 651 Fed.Appx. 44, 48-49 (2016); *United States v. Carty*, 264 F.3d 191, 196 (2d. Cir. 2001)), and the Court is urged to take them into account in this case.

The Court is also asked to reduce any sentence that it might otherwise impose, because after Mr. Rakhmatov completes his prison sentence, as a non-citizen, he will be transferred to an immigration jail where he will await deportation for months or years. If he is deported to Uzbekistan, it is likely he will be persecuted and tortured there. *Yusupov v. Attorney General*, 650 F.3d 968, 977-78, 993 (3d Cir. 2011). See the report of Dr. Adeeb Khalid, Ex. 3. Even if his petition for relief under the Convention Against Torture is granted, the relief would be the withholding or delay of removal, and he will remain in a United States prison

38

indefinitely. Thus, whatever sentence the Court imposes will only be part of the indefinite detention Mr. Rakhmatov will face, and it should be shortened accordingly. *United States v. Jumaev, supra* at pp. 31-32. "This case presents circumstances not adequately taken into consideration by the Sentencing Guidelines" [including Mr. Rakhmatov's] "owing of a debt, his extraordinary period of pre-trial detention, his prolonged absence from his family, his immigration situation, and the lack of rehabilitation programs for him." *Id* at 27.

(5). <u>Protection of the Public</u>

Given all of the above, there is no reason to believe that Mr. Rakhmatov poses a danger to the American public. His only criminal conduct in this country was directed at the criminal regime of Assad in Syria, and that conduct was minimal, limited, non-violent, and non-ideologically motivated. He has shown remarkable altruistic, artistic and disciplined work in prison. The Court is urged to follow the Judges in at least the Districts of Connecticut and Colorado who in similar circumstances have held,

> As Judge Janet Hall found in *United States v. Ahmad,*
> No. 3:04-cr-00301-JCH (D. Conn. July 16, 2014),[29] I
> cannot sentence Mr. Jumaev on an unfounded fear that he
> might do something and extend his sentence as a result. I
> must look at what he actually did and determine whether
> it is likely that he will do something similar or greater in
> the future. From the facts before me, I find it is not.

Id. at 30.

An additional long prison term for Mr. Rakhmatov will not add to protection of the public or additional deterrent to crime, and there is the danger of radicalization. As Judge Kane found in *Jumaev, supra* at 31. (Ex. 1).

39

> To my knowledge, the Bureau of Prisons offers no
> relevant training or rehabilitation programs available for
> Mr. Jumaev and his crimes. This is significant, because
> there is little hope that the negative influences resulting
> from a longer period of incarceration will be balanced
> with a productive program. I have considered the
> opportunity for Mr. Jumaev to pursue additional
> education opportunities while imprisoned but have
> determined that potential benefit is outweighed by
> the other factors.

Dr. Marc Sageman, psychiatrist, researcher and writer on terrorism, who has personally interviewed and studied many terrorists ( see his resume attached to his report, Ex.18) cites data in his report that recidivism is extremely low for defendants convicted of terrorism, much lower than the recidivism rates for criminal defendants in general. Mr. Rakhmatov, in particular, he opines,"is certainly not dangerous in the criminal sense" and he does not even "show ... the indicators common to jihadis," the type of terrorism offender included in those studies; he appears not to have been ideologically or religiously motivated to conduct jihad as those studied were. Ex. 18 at pp. 10-11.

## MR. RAKHMATOV'S LETTER TO THE COURT

Reprinted on the following two pages, in its original format and in Mr. Rakhmatov's artful handwriting, is his letter to the Court expressing remorse for his offense and pleading to return to his family.

40

Dear Judge Kuntz, i have alot to say, but i don't have enough words to describe my pain and regrets. Five years ago i gave 400 dollars to someone that turned my life upsid down. I am very imbareced on front of my family and on front of all the people that always expected better from me. I wish if i could bring the time back and to do things differently, i would never do that stupid mistake ever again. I lost alot.. i missed my childrens first steps, first words, i wasn't there all this years when they needed me at most, when they were homeless, when they were sick, when they cried and when they smiled. I wasn't there when my wife couldn't find somebody for just to hold the kids so she could get her operation done, she had tumor in her belly and three times she had to go thru operation and finally got removed. Her weight was 89 pounds at that time. My wife and my children suffered all this years and my parents also lost alots of their health because of me being in jail. Our family life became dissfunctional, sad and dark. And i blame myself for all this, my irrational desicion caused all this pain to my family and to myself. I cant justife my wrong doing, i own it and i regreted thousand times. All i wanted is to help people. I don't hold any ill for nobody, i wish and pray that one day all the people come togather and live in peace without any harm to each others, and will be no fear for orphans and widows, elders and the poor.

40A

Dear Judge., i did mistake and i am very sorry. I am a man who always gave to people and never asked anything in return. Today i can't give anything but my word, to every single person who know me and who been dissapointed at me, i promise that i'll do everything that it takes. i am living example for my family and friends and for those many youth that full of energy and don't know what to do with their life.

i didn't leave any single opportunity in jail possibly could make me any better man, or a father, or a husband, or a son, or a rational, productive human being. i learned my lesson, please don't send me to jail, send me to my family.

With Hope  Aziz  08.06.20



40.B

## CONCLUSION

For all of the above stated reasons, Mr. Rakhmatov submits that a sentence of time served, or at most the Guidelines sentence of 63 to 78 months without the terrorist and violence enhancements, would be the most parsimonious and would best serve the interests of justice and due process of law.

Respectfully submitted,

S/Lawrence Mark Stern

LAWRENCE MARK STERN
Attrorney for Azizjon Rakhmatov

41